IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DAMIEN MARCUS RUDEBUSH
and RONALD ARTHUR KNIPFER,

OPINION & ORDER

Plaintiffs,

v.                                                         14-cv-169-jdp

CAPTAIN MITCHELL LENSKI,

Defendant.

Plaintiffs Damien Rudebush and Ronald Knipfer, civil detainees confined at the Sand Ridge Secure Treatment Center, are not allowed to possess books about video game "cheat codes," codes can that unlock content within video games. They are proceeding on federal First Amendment and due process claims, as well as state law conversion and negligence claims, against defendant Mitchell Lenski for wrongfully withholding two cheat code books that plaintiffs ordered from outside the facility.

Defendant has filed a motion for summary judgment. After the parties completed summary judgment briefing, plaintiffs filed a motion to voluntarily dismiss their claims for money damages, leaving only their claims for injunctive and declaratory relief. I will grant defendant's summary judgment motion on plaintiffs' due process claim but deny it on plaintiffs' First Amendment claim. Because this court cannot grant injunctive or declaratory relief on plaintiffs' state law claims, I will dismiss those claims. I will direct defendant to show cause why the court should not enter judgment in plaintiffs' favor on the First Amendment claim and order defendant to deliver the cheat code books to plaintiffs.

UNDISPUTED FACTS

Unless otherwise indicated, the following facts are undisputed.

**A. Parties**

Plaintiffs Damien Rudebush and Ronald Knipfer are both persons civilly committed to the Sand Ridge Secure Treatment Center as sexually violent persons under Wisconsin Statutes Chapter 980. Sand Ridge is a secure treatment facility operated by the Wisconsin Department of Health Services (DHS). Defendant Mitchell Lenski is employed by DHS as a supervising officer (captain) at Sand Ridge. Defendant supervises staff and is responsible for the administration and coordination of security at the facility.

**B. Sand Ridge policies**

Sand Ridge's mission is to provide specialized mental health treatment, rehabilitation, training, and supervision to patients housed in the facility. A secure setting is necessary to ensure the effectiveness of the treatment, and to ensure patients and staff are afforded a safe therapeutic environment.

Sand Ridge allows patients to obtain and possess personal property subject to DHS rules and institution policies, taking into account security and treatment concerns. All property entering Sand Ridge must be screened, searched, x-rayed, and approved prior to the patient receiving the item. All property items must be sent new from an approved retail vendor. If a piece of property is denied, the patient has the option to send it back to the vendor at the patient's expense. Alternatively, the item will be thrown away.

Sand Ridge policy #SR 115, titled "Patient Personal Property," states that "[q]uestionable items that need review for treatment/security reasons will be processed in

2

accordance with policy SR479 Review of Patient Reading Materials and Pictures," and that "[s]taff will review incoming publications for contraband." Dkt. 38-1, at 8, 22.

Sand Ridge policy #SR 479 states, "Content of reading materials and pictures are scanned for contraband upon arrival at the facility. The Security Director, Administrative Captain or Mail and Property Captain will review materials suspected of containing material that threatens the security of the facility." Dkt. 38-3, at 1-2. It also states that "[a]n item defined as contraband for the facility due to security reasons will be banned from the facility without further review." *Id*. at 2. Staff denies approximately 800 property or mail items each year.

Policy #SR 401, titled "Client Rights Limitation or Denial Documentation Process," describes the process used when curtailing a patient's rights to "make telephone calls, wear one's own personal clothing or keep one's personal property, adequate storage space, privacy in toileting and bathing, and to see visitors daily." Dkt. 40-2, at 1. When a staff member concludes that it is necessary to curtail a patient's right under this procedure, the staff member fills out a Client Rights Limitation or Denial Documentation (CRLDD) form. The form is given to the patient and the patient is given a chance to attend an "Informal Hearing/Meeting" within three days. The policy also states that "[c]ertain property items are prohibited per policy for all patients at SRSTC. When property is not allowed under these circumstances, a CRLDD does not have to be completed." *Id*. at 4.

Sand Ridge Policy #SR 477 prohibits patients from communicating with another person "by a method not authorized by the facility." Dkt. 38-7, at 7. Some examples of unauthorized communication include "unrecognizable languages, alphabets, symbols or

codes." Dkt. 38-4, at 2. Symbols or codes can conceal gang messages, escape plans, plans to injure another, or messages regarding counter-therapeutic behavior.

Since 2005, patients have been prohibited from purchasing any new video games or video game systems, components, or accessories. Sand Ridge has grandfathered the use of pre-existing approved systems to play pre-approved games on a limited basis. Policy #SR 485, titled "Video Game Policy," describes access to video games. Patients are prohibited from possessing games that depict the following:

      1. Normalizes violence

      2. Sensationalizes and/or supports criminal or illegal activity

      3. Encourages drug use

      4. Depicts degrading sex or sadomasochism

      5. Depicts gratuitous violence or senseless killing

      6. Includes sex with minors

      7. Includes full front nudity

      8. Depicts children in a sexualized way

      9. Non-consensual sex or sexual assault

      10. Primarily meant for an audience of children

      11. Games that promote gambling

Dkt. 38-8, at 2.

The policy was implemented because of concerns that video games could be used as tools by sex offenders to groom victims; some patients used video games to an extent that could be characterized as an obsession or addiction, rendering patients unable to remain awake and alert during treatment; and constant video game use could foster self-isolation. Staff is concerned that the content of some video games may send inappropriate messages

4

about violence, fraud, sex, women, and children. The video game rating system[1] does not necessarily account for these considerations. Some games have so many levels or so much content that it would be extremely difficult for staff to access and review the entire game.

Sand Ridge Deputy Director Doug Bellile, who was an administrative captain overseeing property issues from 2010 to 2014, states that "[w]e did not have the time, money, or staffing to sit down and wade through each level of a video game to ensure its content was appropriate for our patients," and that the ban on new systems or games "helped to minimize these concerns." Dkt. 42, at 9, ¶ 38.

Under the 2005 policy, patients are not allowed to own any of the video game systems covered in the cheat code books at issue in this case. Sand Ridge possesses at least one Xbox 360, which does have games covered in the cheat code books. The Therapy Department has group activities that involve games on the Xbox 360. Also, the Xbox 360 console and games get moved among different units on Sundays for patients to play in the day room. Plaintiffs state that there are also Xbox 360s in the "Life Center" and "Transitional Living Unit." Sand Ridge purchases the games for the Xbox 360s. Patients can request certain games for purchase by Sand Ridge Therapeutic Services staff. Most of the Xbox 360 games currently owned by Sand Ridge are sports games.

Patients are allowed to possess certain "gamer" magazines, such as PC Gamer Magazine, Official Xbox Magazine, and Game Informer. These magazines contain detailed

---

[1] The "Entertainment Software Rating Board" provides ratings for video games in a fashion similar to ratings for motion pictures or television shows. *See* https://en.wikipedia.org/wiki/Entertainment_Software_Rating_Board (last visited September 28, 2016); http://www.esrb.org/about/ (last visited September 28, 2016).

information about upcoming video games, video game hardware, and programming studios, interviews with game designers, and small amounts of cheat codes.

## C.  Denial of books

On January 28, 2014, the Sand Ridge property room received two copies of two books via U.S. Mail, one copy of each book for each plaintiff. One book was Prima Games' *Codes & Cheats Vol. 1 2013*. The other was BradyGames' *Cheat Code Overload 2013*. The two books each identify cheat codes and passwords for video games and cell phone games. The codes can unlock content such as new levels, new weapons, or new characters. Among the examples cited by defendant are these from *Lego Star Wars III: The Clone Wars*: "x1v7n2" to unlock the "Dark Side" effect, "2d7jns" to unlock "Regenerate Hearts," "b1d3w3" to unlock "Super Speeders," "6mz5ch" to unlock "Stud Magnet," and "MELL07" to "Unlock Savage Oppress." Dkt. 39-1, at 2; Dkt. 50, at 4-5, ¶ 11. Defendant also provides an example of a different type of content in the books: tables of information about certain games, such as how many "trainer points" are required to unlock various dog breeds in *Nintendogs + Cats: French Bulldog & New Friends*. Dkt. 39-2, at 2; Dkt. 50, at 4-5, ¶ 11. The books have no other content, such a narrative articles describing or reviewing video games. The total cost of the books for each plaintiff was $20.73.

Plaintiff Rudebush says that he ordered the books for four reasons: (1) for "[r]ehabilitation to equip [himself] with the skills and knowledge needed to be able to become a video game programmer when [he is] released"; (2) "books of its type sell out fast and have very little re-print value, so [he] wanted to get the books before they were gone"; (3) he previously had video game strategy books taken from him because they contained "role playing" materials forbidden at Sand Ridge and the cheat code books contained no such

material; and (4) to confirm his suspicion that Sand Ridge staff confiscated books because they were about video games. Dkt. 49, at 8-9, ¶ 19. Plaintiff Knipfer says that he ordered the books to use "for when [he] play[s] another patients game system." *Id*. at 9, ¶ 20 (alterations in original). Neither Rudebush nor Knipfer owned a video game system when they ordered the books. Nor does any other Sand Ridge patient personally own a system covered by the cheat codes in the books.

Defendant Lenski decided to deny plaintiffs the books based on institution policy. Defendant filled out "Property Receipt/Disposition" and "Review of Patient Reading Material/Pictures" forms for each plaintiff, stating that they could not have the books. Defendant stated on both sets of forms that "patient does not have game system," and "books contain codes that are denied by policy & procedures." Dkt. 38-6, at 2; Dkt. 40-1, at 13. Defendant did not issue plaintiffs a CRLDD form or offer a predeprivation hearing.

Sand Ridge has a four-stage "Client Rights Grievance Resolution Process." In the first stage, a "client rights facilitator" investigates the grievance, makes a decision, and issues a written report. Appeals are made to the Sand Ridge director. The next round of appeals is heard by a "client rights specialist" from the DHS central office, who investigates the grievance and issues a written decision. The final round is an appeal to the state administrator of the Division of Mental Health and Substance Abuse Services.

Plaintiff Rudebush filed a solo grievance about confiscation of the books on January 29, 2014, but he and plaintiff Knipfer followed with a joint grievance the same day. The parties do not explain what happened to the solo grievance, but the joint grievance was denied by the clients right facilitator, who concluded that defendant's denial of the books was appropriate on security and therapeutic grounds. Plaintiffs' appeal was denied by the Sand

Ridge director, who gave plaintiffs a deadline to send the books back to the vendor or have them destroyed. Plaintiffs appealed, but before a decision was issued, they filed this lawsuit. The stage three appeal was dismissed because plaintiffs had taken their complaint to court. There is no indication that plaintiffs appealed this decision to stage four.

ANALYSIS

**A.  Summary judgment standard**

To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). All reasonable inferences from the facts in the summary judgment record must be drawn in the nonmoving party's favor. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999). If the nonmoving party fails to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the moving party is proper. *Celotex*, 477 U.S. at 322.

**B.  First Amendment**

Plaintiffs bring a claim under the First Amendment for defendant Lenski's withholding of the cheat code books. The Supreme Court has recognized that prison inmates retain a limited First Amendment right to receive and read materials that originate outside the prison. *E.g.*, *Thornburgh v. Abbott*, 490 U.S. 401 (1989); *Turner v. Safley*, 482 U.S. 78 (1987); *Procunier v. Martinez*, 416 U.S. 396 (1974). Inmates' rights to receive and read

8

materials from outside the prison are limited by *Turner*, which allows prisons to restrict a prisoner's First Amendment right to free speech if such a restriction is "reasonably related to legitimate penological interests." 482 U.S. at 89.

As I stated in the order screening plaintiffs' claims, the *Turner* analysis should apply even though plaintiffs are civil detainees under Wis. Stat. Chapter 980 rather than prisoners. Dkt. 11, at 3 (citing *Hedgespeth v. Bartow*, 09-cv-246-slc, 2010 WL 2990897 (W.D. Wis. July 27, 2010). The Seventh Circuit has recently confirmed this as the correct standard. *Brown v. Phillips*, 801 F.3d 849, 853 (7th Cir. 2015) ("Keeping in mind the detainee's and state's interests when the state detains sexually violent persons, we think that *Turner's* rational-relationship test provides the appropriate structure to analyze [civil detainee's First Amendment] claims."). In applying *Turner*, courts must recognize "'the different legitimate interests that governments have with regard to prisoners as compared with civil detainees,'" *Id.* at 853 (quoting *Lane v. Williams*, 689 F.3d 879, 884 (7th Cir. 2012)). I must take into account that "'[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.'" *Id*. (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982)). Some legitimate state interests in the Chapter 980 detainee setting include "the security of the facility and the incapacitation and treatment of civil detainees." *Id*.

In determining whether a restriction is reasonably related to legitimate state interests, the Supreme Court has set out a four-factor test: (1) the existence of a "valid, rational connection" between the restriction and a legitimate, neutral government interest; (2) the existence of alternative methods for the detainee to exercise his constitutional right; (3) the effect the detainee's assertion of that right will have on the operation of the facility; and (4)

the absence of an obvious, easy alternative method to satisfy the government's legitimate interest. *See Turner*, 482 U.S. at 89-91.

The first *Turner* factor is often viewed as a "threshold" factor that can be dispositive for either party. *Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010) ("The four factors are all important, but the first one can act as a threshold factor regardless which way it cuts."). In evaluating whether there is a valid, rational connection between a speech restriction and the state's legitimate penological interests, the initial burden of proof rests on the defendant state officials. *Id*. at 536-37. Once the defendants offer a "plausible explanation" for the speech restriction, the burden shifts to plaintiffs to present evidence undermining the state officials' explanation. *Id*. In this case, I conclude that defendant has failed to carry his initial burden of presenting a plausible explanation for why he believed it was necessary to confiscate the cheat code books.

Defendant presents two penological interests, both related to maintaining facility security: (1) preventing patients from communicating in codes; and (2) enabling Sand Ridge staff to monitor video games.

### 1. Communicating in code

There is little doubt that Sand Ridge officials have good reason to forbid patients from communicating in code, as such communications could conceal escape plans, gang communications, or other potentially dangerous messages. But defendant must still make a plausible connection between this interest and the restriction at issue. The state must "show more than a formalistic logical connection between a regulation and [its institutional] objective." *Beard v. Banks*, 548 U.S. 521, 535 (2006). It must present "some evidence to show

that the restriction is justified." *King v. Fed. Bureau of Prisons*, 415 F.3d 634, 639 (7th Cir. 2005). I conclude that defendant fails to make this showing.

As defendant points out, the two books at issue here contain "tables upon tables of letter and number combinations that are linked to other meanings." Dkt. 36, at 8. But the state does not explain how any of those "other meanings"—like an instruction to "enter 'x1v4n2' to unlock the 'Dark Side effect'" or a table explaining how many "trainer points" are required to unlock dog breeds in a pet simulation game—could be used by patients for a nefarious purpose. The books do not contain complete coded languages; they contain lists of ways to unlock content within video games. Nor are the books "how to" guides for encrypting messages.

Defendant states that "a patient could use the book to create a manual to communicate in code," "[p]atients could expand upon the already written code to create a new language, undecipherable to security staff," and [t]he key could be discreetly transferred between patients via the cheat code books." Dkt. 36, at 7-8. But he does not elaborate on how this could be achieved with the material in these books or otherwise explain how the particular "already written code" at issue here lends itself to transformation into a new language. Plaintiffs point out that "[i]f patients/inmates wished to communicate in code historically they have found ways to do it with the most benign subject matter." Dkt. 43, at 6. This is exhibited in one of the cases cited by defendant in discussing the dangers of coded messages. *See* Dkt. 36, at 9 n.1 (citing *United States v. McIntosh*, No. CR 02-938 (A) VAP, 2008 WL 4754763, at *3 (C.D. Cal. Mar. 14, 2008) ("a communication between [Aryan Brotherhood] members stating that a baby boy was born 'would be an indication to take violent action and if a baby girl was born it would be just the opposite.'")).

11

So while I agree with defendant that Sand Ridge has good reason to clamp down on coded communications, the state still must present some evidence that the cheat code books at issue here could actually help patients communicate in code. Although I must give deference to the professional judgment of the state officials operating Sand Ridge, *Thielman v. Leean,* 282 F.3d 478, 483 (7th Cir. 2002) ("facilities dealing with those who have been involuntarily committed for sexual disorders are 'volatile' environments whose day-to-day operations cannot be managed from on high"), defendant has presented nothing more than speculation that the books might somehow be used to facilitate coded communications. The state has failed to show a plausible connection between its desire to eliminated coded communications and the confiscation of the cheat code books.

### 2. Monitoring video games

Defendant also contends that "[t]he books . . . implicate Sand Ridge's legitimate interest in monitoring video games" because the cheat codes could unlock hidden content, and "there would be no way to know if a game which was seemingly benign, had been altered to include otherwise prohibited content." Dkt. 36, at 10. Defendant has identified a legitimate interest in maintaining effective therapy for patients by disallowing access to "counter-therapeutic" content such as content that "[n]ormalizes violence," "[s]ensationalizes and/or supports criminal or illegal activity," or "[i]ncludes sex with minors." Dkt. 50, at 29, ¶ 5. Defendant states that allowing the cheat code books would make it more difficult to monitor the facility's video games for this type of content.

But, as with the security rationale, defendant does not establish a plausible logical connection between this interest and the restriction at issue. To start with, defendant provides no example of a code in the books that reveals prohibited content. And the vast

majority of the codes do not apply to games or systems allowed at Sand Ridge. But even for the codes that might apply to games available at Sand Ridge, defendant does not show that allowing plaintiffs to have the books would increase the staff's monitoring burden.

Staff undoubtedly does not have the time to go through each cheat code for each game available at Sand Ridge to check the content that each code unlocks. But defendant does not suggest that an exhaustive review is necessary or already happening with regard to video games: there is no evidence that Sand Ridge officials comprehensively review all of the content available on games before allowing them. The record shows that Sand Ridge officials make general judgments about individual games, relying in part on the video game rating system, and sticking mostly to sports games seemingly unlikely to contain sexually explicit or violent content, rather than going through an arduous process of poring over all of the content available in those games. Which is understandable: officials do not have the time to exhaustively review each game any more than they can review every page of each book or periodical that enters the facility.

But there is no evidence that the cheat codes in these books create a plausible loophole through which banned content could be hiding in an otherwise innocuous game of the type allowed at Sand Ridge, at least any more plausibly than such content could already be lurking in the normally accessible content in a video game or any other media. Perhaps defendant's concern is animated by stories like those about the "Hot Coffee" modification to *Grand Theft Auto: San Andreas*, where an "unlockable sex mini-game" was found within the game. *See* http://money.cnn.com/2005/07/20/technology/personaltech/gta/ (last visited September 28, 2016). But that controversy involved a game that had already been rated "M" for "mature," replete with sexual and violent content, that never had the slightest chance of

13

being allowed at Sand Ridge. The question is how plausible a similar threat might be given the rules already in place at Sand Ridge. Is the concern here that patients are going to unlock sexually explicit or violent hidden content in otherwise innocuous sports games in the middle of group activities at the Therapy Department or in the day room, presumably in full view of Sand Ridge staff? Nothing presented by defendant suggests that this is remotely plausible.

Accordingly, I conclude that defendant fails to make a plausible connection between either of his stated rationales and the decision to confiscate the cheat code books. Defendant's failure to make a showing under the first *Turner* factor is enough to doom his motion for summary judgment. But that does not mean that plaintiffs are automatically entitled to judgment as a matter of law. Federal Rule of Civil Procedure 56(f)(1) gives this court the power to grant summary judgment for plaintiffs, but only after giving defendant notice and an opportunity to respond. Although it seems unlikely that there are any factual issues left to be tried, I will direct defendant to show cause why the court should not enter judgment in plaintiffs' favor and order defendant to deliver the cheat code books to plaintiffs. Plaintiffs will be given a chance to respond.

## C. Due process

Plaintiffs bring a due process claim against defendant, alleging that defendant denied them a predeprivation hearing they were entitled to under state procedures. But they are incorrect in their view that Sand Ridge procedures dictated that they receive a predeprivation hearing, so summary judgment must be granted to defendant on this claim.

The Due Process Clause of the Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. To prevail on a § 1983 procedural due process claim, a plaintiff must

14

demonstrate that he: (1) has a cognizable property interest; (2) has suffered a deprivation of that interest; and (3) was denied due process. *Khan v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010).

Plaintiffs contend that defendant should have given them a CRLDD form and then a hearing about the denial of the books. But Sand Ridge policy #SR 479 makes clear that incoming mail is scanned for contraband by an individual supervisory staff member and that contraband is confiscated "without further review," and policy #SR 401 states that a CRLDD form does not need to be completed when contraband is confiscated from incoming mail. Defendant's actions did not violate Sand Ridge procedures.

Even if I construed plaintiffs to be saying that Sand Ridge procedures themselves, rather than defendant's conduct, violated their due process rights, I would grant summary judgment to defendant.

Plaintiffs had a property interest in the books, at least assuming that they were not indeed contraband. *See Anderson v. Fiedler*, 798 F. Supp. 544, 549 (E.D. Wis. 1992) ("prison inmate 'cannot seriously argue' that he has a protected property interest in contraband destroyed as such by prison officials" (quoting *Lyon v. Farrier*, 730 F.2d 525, 527 (8th Cir. 1984))). I will also assume that the proposed solution to send the books back to the vendor or destroy them deprived plaintiffs of their property interest. *See Munson v. Gaetz*, 673 F.3d 630, 638 (7th Cir. 2012) (suggesting that "prisoner is not deprived of a property interest when he is able to send the property to a destination of his choice."); *Searcy v. Simmons*, 299 F.3d 1220, 1229 (10th Cir. 2002) (sending prisoner's property to relatives was not deprivation of property ownership).

But plaintiffs received all the process they were due. All that was required was that plaintiffs had a chance to challenge the confiscation of the books via grievance procedures, which they did. *See Munson*, 673 F.3d at 638 (prisoner "received all the process he was due in the form of a written notice explaining why he couldn't possess the books and a meaningful chance to be heard by a series of prison officials.").

**D. State law claims**

I granted plaintiffs leave to proceed on state law claims for conversion and negligence. Now that plaintiffs have voluntarily dismissed their damages claims, I must dismiss their state law claims, although not for reasons discussed in defendant's briefing, which predated plaintiffs' voluntary dismissal. This federal court cannot grant the relief plaintiffs now seek under these state law theories. With respect to injunctive relief, sovereign immunity principles prohibit federal courts from enjoining state officials under state law. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). This limitation applies to declaratory relief as well. *Benning v. Bd. of Regents of Regency Univ.*, 928 F.2d 775, 778 (7th Cir. 1991).

ORDER

IT IS ORDERED that:

1. Plaintiffs Damien Rudebush and Ronald Knipfer's motion to voluntarily dismiss their claims for money damages, Dkt. 54, is GRANTED.

2. Defendant Mitchell Lenski's motion for summary judgment, Dkt. 35, is GRANTED with respect to plaintiffs' due process claim, but DENIED with respect to plaintiffs' First Amendment claim.

3. Plaintiffs' state law claims for conversion and negligence are DISMISSED.

4. Defendant may have until October 19, 2016, to show cause why the court should not enter judgment in plaintiffs' favor and order defendant to deliver

16

the cheat code books to plaintiffs. Plaintiffs may have until November 9, 2016, to file a response.

Entered September 28, 2016.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

17